UNITED STATES of America, Appellee,

v.

Richard A. DOUGHERTY, Appellant.

No. 84–5152.

United States Court of Appeals,
Eighth Circuit.

Submitted April 11, 1985.
Decided May 31, 1985.

Peter Thompson, Minneapolis, Minn., for appellant.

Janice M. Symchych, Asst. U.S. Atty., Minneapolis, Minn., for appellee.

Before LAY, Chief Judge, McMILLIAN, Circuit Judge, and WOODS,* District Judge.

HENRY WOODS, District Judge.

After a jury trial, the appellant, Richard A. Dougherty, was found guilty of twenty-five counts of misapplying $14,500,000 in funds of the First National Bank of St. Paul, Minnesota, and falsifying the bank's books and records. The nine counts of misapplication dealt with the improper issuance of bankers' acceptances in violation of 18 U.S.C. § 656. The remaining sixteen counts charged a violation of 18 U.S.C. § 1005 in that appellant willfully failed to record these transactions. Appellant was given concurrent sentences of a year and a day on three counts, five years of probation, and a $15,000 fine on the remaining counts by the trial judge.[1] Appellant challenges the sufficiency of the evidence and the correctness of the jury instructions. We affirm the convictions.

Appellant was a vice president in charge of the International Banking Division of the third largest bank in the Ninth Federal Reserve District. The offenses charged were mainly related to the financial difficulties of a seafood processing venture by Transalaska Fisheries Corporation (Transalaska). Based in Seattle, the company proposed to convert a ship into a floating seafood processor and to harvest mainly king crab. In April, 1979, Dougherty secured approval of the bank's loan committee for a $3,500,000 advance for which Transalaska gave a term note. Conversion of the ship ran into delays and cost overruns, with the result that the ship was not ready for the 1979 king crab harvest. The 1980 season fell far below expectations. During conversion in September, 1979, Dougherty disbursed $350,000 beyond the approved limit, documenting the excess amount in a memo to the bank's president and in comments placed in the Transalaska credit file (T. 162–63). Transalaska's financial difficulties worsened, and its officers began calling on Dougherty for more financing. He complied by using the device of unapproved bankers' acceptances.[2] The First National Bank of St. Paul required

---

* The Honorable Henry Woods, United States District Judge for the Eastern District of Arkansas, sitting by designation.

1. The Honorable Edward J. Devitt, Senior United States District Court Judge, District of Minnesota.

2. A bankers acceptance is a negotiable instrument, governed by 12 U.S.C. § 372 and applicable regulations and rulings of the Federal Reserve Board, which define and interpret the "eligibility" of the financing instrument (Anderson 10). An "eligible" bankers acceptance is one which the Federal Reserve has authority to purchase (Anderson 10). Eligible bankers' acceptances ordinarily, and for purposes of this case, are used to finance shipments of goods between foreign countries (Anderson 12–13). The typical transaction involves an exporter who proves in some manner to the bank that he has a given amount of product which will be shipped to a foreign country. He must have goods or a firm contract at least equal to the amount of financing. The shipment must be consummated in 180 days or less. The bank may then agree to finance for whatever period of time the shipment will require by taking the exporter's promise to pay in the form of a written draft. The bank stamps the word "accepted" on the draft, and the authorized officer signs or initials the item. The document will provide for a given sum to be due on a given date, correlating with the completion of the shipment. An authorized officer then places on the face of the instrument an eligibility clause, describing the international transaction in goods which is represented by the acceptance. The proceeds of the shipment then are to be used to liquidate the transaction, without expectation of resorting to collateral or other security. (Anderson 25, 31; T. 613.) The bank may choose to hold the acceptance until maturity, at which time the customer pays the bank. More commonly, however, the bank sells acceptances at a discount on the secondary market, with the bank paying the holder in the face amount upon maturity (Anderson 44–49). The market maintains a high interest in the instrument because it is a secure, no-risk investment due to the bank's absolute obligation to pay upon maturity, regardless of the customer's ability to pay the proceeds from the transaction (Anderson 85; T. 476).

approval of its senior loan committee for loans and credit extensions in excess of $100,000 (T. 143–45). Dougherty sat on the senior loan committee and participated in its weekly discussion and decisions on lending (T. 123–27, 1078–80). He presented none of the bankers' acceptances for Transalaska to the loan committee for approval (T. 15, 1361–62, 1378–79). Nor were they posted in the bank's general ledger. Proceeds of the acceptances were deposited into the company's checking account. On maturity date Dougherty paid off the maturing acceptance with a new one, in an amount equal to or greater than the maturing acceptance, since the customer was unable to meet the obligation on its due date. An overdraft would have resulted if he had allowed the account to be charged on the due dates. When a customer's account suffers an overdraft of $1,000 for five days, a computerized printout automatically goes to the loan review personnel (T. 169, 1090). This pattern of roll-overs prevented what would have been a series of overdraft reports from coming to the attention of the loan review committee.

The same system of bankers' acceptances and concealment was used by Dougherty to finance the operation of David Noland, who was engaged in the restaurant business in the Minneapolis-St. Paul area. Dougherty extended Noland more than $400,000 in bankers acceptances during 1979 and 1980, none of which were paid. These advances were made in spite of the fact that Noland was a very poor credit risk.[3] If anything, bankers' acceptances were more inappropriate in Noland's case than in the advances to Transalaska Fisheries.[4] Although the Transalaska and Noland transactions were not recorded in the

bank ledger, Dougherty maintained a private desk drawer accounting of the transactions (Berg 31).

When it appeared that an audit in progress would uncover the concealed multi-million dollar losses of the bank, Dougherty went to the bank president and confessed that he had issued the unauthorized acceptances. Four days later he tendered his resignation. There is no evidence that appellant personally profited from any of these transactions or that he had any type of special relationship with the officers of Transalaska Fisheries Corporation or David Noland.

## I. SUFFICIENCY OF THE EVIDENCE

In determining the sufficiency of the evidence, this court must accept all reasonable inferences in support of the jury verdict and resolve all conflicts in its favor. *Klein v. United States,* 728 F.2d 1074 (8th Cir.1984). The fact that appellant did not personally profit from his criminal conduct is not a legal excuse for his action. *United States v. Mouton,* 617 F.2d 1379, 1385 (9th Cir.1980), *cert. denied,* 449 U.S. 860, 101 S.Ct. 163, 66 L.Ed.2d 77 (1980). There was a great deal of conduct on appellant's part on which the jury could have based a guilty verdict. The jury was entitled to conclude that appellant led the bank's internal auditor, Patricia Slater, to believe that lending limits were monitored with respect to bankers acceptances by virtue of monthly reports to the loan committee. (*See* Exhibit A, Question 3(c) to the testimony of Patricia Slater.) This was a false statement, as were his statements to the same auditor that the acceptances were

---

**3.** He had been discharged from his employment and had a poor credit record, and his commission checks from a former employer were assigned to the bank (T. 171–72). In November, 1980, he had a negative net worth of $635,000 (T. 176).

**4.** In sum, the prerequisites to an eligible bankers' acceptance are: 
 (a) that there be a specific transaction involving the shipment of goods usually between foreign countries;

(b) that there be actual goods or a firm contract for sale of the goods, in either case, representing at least the face value of the acceptance; (Anderson 26, 29);
(c) that the transaction take no longer than 180 days, to correlate to the time set forth on the acceptance; and
(d) that the acceptance be paid upon maturity with the proceeds of the transaction. (Anderson 12, 79; T. 1350–52.)

accounted for in ledger entries (Slater 25–26). The jury could quite understandably have disbelieved Dougherty's statement that he did not record the transactions because he was too immersed in the daily business of Transalaska and Noland (T. 1247–49), particularly since he found time to record the transactions in a private log kept in his desk (T. 1413–15). The jury was entitled to infer that the motive for not recording 72 unapproved bankers' acceptances was to practice deception on officials of the bank. The jury was also entitled to believe that appellant used bankers' acceptances in an unconventional and improper fashion and breached virtually all the statutory and regulatory requirements for such instruments.[5] In so doing, appellant was actually extending conventional loans to Transalaska and Noland totally beyond his authority and in complete circumvention of the bank's loan committee. By this secretive device he extended $14,500,000 in unauthorized credit to these two customers. This amount of absolute liability on the part of the bank caused its financial condition to be misrepresented during the period involved to its officers, shareholders, the public, and the federal bank examiners. The evidence in this case is sufficient to show an intentional misapplication and falsification of bank records. Such evidence has been found sufficient in several cases before this court involving similar improprieties on the part of bank officials.[6]

## II. THE INSTRUCTIONS.

### A. Specific Intent.

Appellant argues vigorously that the court should have instructed that specific intent was a necessary element in all the charges and that the court erred in refusing his proferred instruction No. 20 (A. 21), which is essentially Devitt & Blackmar, *Federal Jury Practice and Instructions*, No. 14.03. This instruction would have required the government to "prove that the defendant knowingly did an act which the law forbids or knowingly failed to do an act which the law requires, purposely intending to violate the law." (A. 21.) In another requested instruction (No. 27), appellant wanted the jury to be told that misapplication required "The specific intent to do something the law forbids; that is to say, with bad purpose either to disobey or to disregard the law." (A. 28.) With regard to the intent element of 18 U.S.C. § 656, Judge Devitt charged that it was only necessary that the government prove "That the defendant acted willfully and with intent to injure or defraud the bank or to deceive its officers, directors, and examiners" (T. 1519). With regard to the intent required for a conviction under 18 U.S.C. § 1005, he charged that the government must prove "that the defendant made or omitted such entry willfully and with knowledge of the resulting falsifying and with the intent to deceive the officers or examiners." He then gave the standard definition of "willfully" and "knowingly."[7]

The above instructions of the trial judge correctly declared the law and are in accord with the view of "specific intent" taken by all the circuit committees who have promulgated Model Jury Instructions. For instance, the Seventh Circuit committee recommends "avoiding instructions that distinguish between 'specific intent' and 'general intent.' In place thereof the Committee recommends that an instruction be given which defines the precise mental state required by the particular offense charged." *Federal Criminal Jury Instructions of*

---

5. See nn. 2 and 4, *supra*.

6. *United States v. Mohr*, 728 F.2d 1132 (8th Cir.1984) (exceeding loan limit and concealing documents); *United States v. Ness*, 665 F.2d 248 (8th Cir.1981) (check-rolling without deposits to customer accounts, which were not really legitimate loans); *United States v. Bevans*, 496 F.2d 494 (8th Cir.1974) (rollover of insufficient fund checks and their treatment as new checks each day to avoid posting as overdrafts).

7. "Willfully" connotes a voluntary, intentional violation of a known legal duty ... and the word "knowingly" ... means that the acts charged were done voluntarily and intentionally and not because of accident or other innocent mistake (T. 1516–17).

*the Seventh Circuit,* p. 79 (West Publishing Co. 1980). This is precisely the course followed by Judge Devitt. The Seventh Circuit Committee points out that appellant's suggested distinction between "general intent" and "specific intent" confuses more than enlightens juries, citing *United States v. Bailey,* 444 U.S. 394, 400–409, 100 S.Ct. 624, 629–36, 62 L.Ed.2d 575 (1980).[8] The requirement that a defendant must know that his act violates the law is ordinarily not an essential element of the offense. "Defendants [are] not entitled to an instruction which [includes] the ... phrase [that the defendant knowingly did an act which the law forbids, purposely intending to violate the law]. 'A requirement of proof not only of this knowledge of likely effects, but also of a conscious desire to bring them to fruition or to violate the law would seem particularly, in such a context, both unnecessarily cumulative and unduly burdensome.' " *United States v. Brighton Building & Maintenance Co.,* 598 F.2d 1101, 1106 (7th Cir.1979) *cert. denied,* 444 U.S. 840, 100 S.Ct. 79, 62 L.Ed.2d 52 (1979) (criminal antitrust prosecution). The same point was made in *United States v. Arambasich,* 597 F.2d 609 (7th Cir.1979) where the court held that the trial court properly refused a stock specific intent instruction. *Accord,* W. LaFave & A. Scott, *Criminal Law* § 28 at 202 (1972); Model Penal Code § 2.02, Comment (Tent.Draft No. 4 1955). "The stock 'specific' and 'general intent' instructions should be avoided in favor of instructions that precisely define the requi-

site mental state of the particular crime charged: e.g. ... 18 U.S.C. § 1005 (intent to injure or defraud a bank)." *Federal Criminal Jury Instructions of the Seventh Circuit,* pp. 81–82 (West Pub. Co. 1980).

The same approach is taken by the Committee on Model Jury Instructions of the Ninth Circuit. "For example, to speak of a defendant's 'purpose' or to use the phrase 'purposely intending to violate the law' requires a jury to find that a defendant knew his act violated the law. Ordinarily, that is not an essential element of the offense, and defendant is not entitled to such an instruction. *Cooley v. United States,* 501 F.2d 1249, 1253 (9th Cir.1974); *cert. denied,* 419 U.S. 1123, 95 S.Ct. 809, 42 L.Ed.2d 824 (1975); *United States v. Fierros,* 692 F.2d 1291, 1293–95 (9th Cir.1982). Thus the standard instructions should be avoided." *Manual of Model Jury Instructions For The Ninth Circuit* (West Pub. Co. 1984).

We believe that the view expressed by the above authorities and formulated by Judge Devitt's instructions is the better view. It also has the approval of the Supreme Court. *United States v. Bailey, supra.*

■ Unless used in the statute itself[9] or unless the crime falls within that rare type of offense where defendant's knowledge that he is violating the law is an element of the offense, there is no occasion for an instruction defining specific intent.[10]

---

**8.** This new approach, exemplified in the American Law Institute's Model Penal Code, is based on two principles. First, the ambiguous and elastic term "intent" is replaced with a hierarchy of culpable states of mind. The different levels in this hierarchy are commonly identified, in descending order of culpability, as purpose, knowledge, recklessness, and negligence. See LaFave & Scott 194; Model Penal Code § 2.02. Perhaps the most significant, and most esoteric, distinction drawn by the analysis is that between the mental states of "purpose" and "knowledge." As we pointed out in *United States v. United States Gypsum Co.,* 438 U.S. 422, 445 [98 S.Ct. 2864, 2877, 57 L.Ed.2d 854] (1978), a person who causes a particular result is said to act purposefully if " 'he consciously desires that result, whatever the likelihood of that result happening from his conduct,' " while he is said

to act knowingly if he is aware " 'that that result is practically certain to follow from his conduct, whatever his desire may be as to that result.' " 444 U.S. at 404, 100 S.Ct. at 631.

**9.** It does not appear in these statutes, and our attention has not been called to any others using the term "specific intent."

**10.** In the case of *United States v. Marvin,* 687 F.2d 1221, 1227 (8th Cir.1982), *cert. denied,* 460 U.S. 1081, 103 S.Ct. 1768, 76 L.Ed.2d 342 (1983), this court held that it was error not to give Devitt & Blackmar § 14.03, the specific intent instruction. An examination of that opinion reveals that the court intended to require, for that particular offense, the defendant's actual knowledge that he was violating the law, thus

### B. Other Objections to the Instructions.

Appellant claims that the trial judge summarized the evidence in a manner that was unfair to him, that he virtually directed a verdict on the misapplication count, and that he failed to submit appellant's theory of the case to the jury. These contentions are without merit. Judge Devitt's summary of the respective positions of the parties was neutral (T. 1527–30). He mentioned in his comments the defenses upon which appellant could justifiably rely. We find no indication of bias or prejudice in the charge to the jury.

 As to the contention that Judge Devitt directed a verdict on the misapplication count, it is sufficient to say that no more was said in his remarks than appellant and his attorney admitted in the course of the trial. Counsel in his opening statement told the jury that except for the issue of intent, there would be substantial agreement with the government's case (T. 63). Then in summation, appellant's counsel stated that the real essence of the case was whether the government had proved an intent to deceive (T. 1480–81). Appellant admitted that approval of the loan committee had not been obtained and that proper entries had not been made, in addition to other significant facets of the government's case (T. 1331, T. 1334). These admissions were acknowledged by appellant's counsel in summation (T. 1481). We agree that the testimony of appellant and statements of his counsel were tantamount to admission of the second element of the offense of misapplication: "That the defendant misapplied the funds or credits of the bank." The issue in the case was whether the government could establish element number three: "That the defendant acted willfully and with intent to injure or defraud the bank, or to deceive its officers, directors, and examiners." (T. 1519.) This

placing the offense of acquiring and possessing food stamps in that narrow range of cases

was made perfectly clear in the instructions of the trial judge (T. 1530).

The convictions are affirmed.

where such knowledge is essential.