# United States Court of Appeals
### For the Eighth Circuit

_____

No. 14-3287

_____

United States of America

*Plaintiff - Appellee*

v.

Robert Allen Walker

*Defendant - Appellant*

_____

Appeal from United States District Court
for the District of Minnesota - St. Paul

_____

Submitted: October 23, 2015
Filed: March 25, 2016

_____

Before LOKEN, MURPHY, and COLLOTON, Circuit Judges.

_____

LOKEN, Circuit Judge.

Robert Allen Walker was president, chief executive officer, and chairman of the board of Bixby Energy Systems ("Bixby") from its formation in 2001 until his ouster in May 2011 following the company's financial collapse. After an eight-week trial, the jury convicted Walker of four counts of mail fraud, eight counts of wire fraud, conspiracy to commit mail and wire fraud, witness tampering, and three counts of tax evasion, violations of 18 U.S.C. §§ 1341, 1343, 1349, 1512(b)(1), and 26

U.S.C. § 7201. Walker appeals, arguing the evidence was insufficient because the government failed to prove he had the requisite intent to defraud Bixby investors, and the district court[1] committed procedural sentencing errors in calculating fraud loss and assessing a two-level enhancement for abuse of a position of trust. We affirm.

## I. Sufficiency of the Evidence.

Walker argues the trial evidence established that he was a naive businessman who had no intent to defraud, an essential element of the seventeen counts of conviction. "In reviewing the sufficiency of the evidence, we consider the evidence in the light most favorable to the jury's verdict, accepting all reasonable inferences that support the verdict." United States v. Brown, 627 F.3d 1068, 1072-73 (8th Cir. 2010), cert. denied, 132 S. Ct 274 (2011). "We must uphold the conviction unless no reasonable jury could find the defendant[] guilty." United States v. Marquez, 462 F.3d 826, 828 (8th Cir. 2006) (quotation omitted).

Prior to forming Bixby, Walker invented an air-chamber mattress, a precursor to the Sleep Number bed. Venture capitalists acquired his family business, renamed it Select Comfort Corporation, improved the mattress design, forced Walker out, and made a successful Initial Public Offering ("IPO"). After leaving Select Comfort, Walker turned his attention to corn-burning stoves and formed Bixby. Bixby produced functioning corn-burning stoves for a few years but never turned a profit. In 2006, the stoves became uneconomical due to unseasonably warm winters and higher corn prices resulting from government-mandated use of ethanol in gasoline.

In mid 2007, Walker turned Bixby's focus from corn-burning stoves to inventing and marketing a machine that would turn coal into synthetic natural gas and

_____

[1]The Honorable Susan R. Nelson, United States District Judge for the District of Minnesota.

a valuable carbon byproduct. From 2007 to 2011, Bixby attempted unsuccessfully to manufacture two different coal-gasification machines in North Carolina and later in Indiana, and to market the non-existent machines in China, all the while paying Walker and his daughter large salaries and expense reimbursements. Bixby's outside directors moved to replace Walker in early 2011. He then worked with Bharat Kothari, an investor from Chicago, to create the appearance that a humanitarian fund in the Philippines would provide needed capital by buying $100 million of Bixby preferred stock. That scheme failed, and Walker was forced to resign. This prosecution followed the company's collapse.

Dozens of witnesses testified at the lengthy trial, and the parties submitted hundreds of documents into evidence. The government's extensive case-in-chief included testimony by eighteen Bixby investors; Dennis DeSender, Bixby's chief financial officer and leading fund-raiser, who had pleaded guilty to tax evasion and securities fraud; numerous other Bixby officers, employees, and attorneys; two accountants who participated in an independent audit of Bixby; Jeff Wiseman, the president of Bixby's Chinese client; an IRS agent and a postal inspector; and Kothari. If believed by the jury, this extensive evidence established that:

- Walker induced persons to invest in Bixby by falsely claiming that he took Select Comfort public and was responsible for its financial success, when in fact he was ousted as Select Comfort's CEO and had no role in its later revival. Many investors testified that Walker's claimed history as a successful businessman was a primary reason for their decision to invest in Bixby.

- Throughout his time at Bixby, Walker enticed prospective investors and current shareholders with repeated promises of Bixby's imminent IPO, concealing many obvious obstacles that prevented a public offering of Bixby stock. While publicly claiming Bixby was about to go public, Walker privately admitted the

company was in no shape to do so. Bixby's directors and attorneys repeatedly told Walker to stop making these false and misleading claims.

- Walker concealed that key Bixby employees and agents were convicted criminals. Walker knew DeSender had been convicted of bank fraud and embezzled from his prior employer. A major Bixby salesman first met DeSender in prison. A Bixby fund-raiser had been convicted of racketeering.

- Walker caused repeated violations of federal securities laws, urging investors to overstate their incomes and assets so Bixby could avoid accredited-investor rules, and violating the rule against paying commissions to unlicensed broker dealers. He also caused Bixby to violate its Private Placement Memoranda by using its funds to pay DeSender millions of dollars in commissions for selling Bixby stock. DeSender kicked back $600,000 of these commissions to Walker personally.

- In 2006, Bixby's Audit Committee engaged independent accountants and lawyers to audit its financial statements. The audit revealed improprieties Walker had concealed. To eliminate this threat, Walker persuaded Bixby shareholders to remove pro-audit directors by lying about Bixby's situation and not disclosing the audit's findings. With the hostile directors gone, Walker terminated the audit and concealed its findings from new outside directors. He had DeSender sign and backdate a "loan document" to explain the newly discovered kickbacks and then persuaded the new board to raise his salary from $130,000 to $325,000, approximately the amount he was no longer receiving in kickbacks from DeSender.

- Walker relied on false public claims regarding Bixby's coal-gasification technology to lull Bixby shareholders and lure prospective investors and potential customers. He publicly claimed the technology was fully developed and verified. He misrepresented his negotiations with Bixby's venture partners in North Carolina and Bixby's effort to produce and market the machines in China. In 2008, he created a

promotional video falsely telling shareholders and investors the technology was ready for market, and a phony "white paper" to persuade institutional investors the technology had been independently validated. The video was played at trial; many investors testified it was highly persuasive. A July 2010 press release falsely reported that Bixby had perfected coal-gasification technology that was ready for market.

- There was extensive evidence of Walker's misrepresentations when he took his supposedly ready-for-market coal-gasification technology to China. Though Walker knew Bixby had neither final orders nor a ready technology, he publicly claimed $12 billion in final orders in China and then falsely blamed Chinese customers when the deals fell through.

On appeal, Walker concedes "[t]here was certainly fraud at Bixby." But, he argues, he was simply a "naive businessman." The real villains were Bixby's North Carolina coal-gasification partners and especially DeSender, a "life long conman." To support this contention, Walker focuses on his trial testimony relating to his 2011 attempt "to save Bixby through the $100 million investment from the Manna Foundation" in the Philippines. "It is nothing short of pure fantasy," his Brief argues, "to believe a mysterious humanitarian fund from the Philippines was going to step in and invest $100 million in a small company in Minnesota without doing much more due diligence than speaking with Mr. Walker. But, Mr. Walker believed that fantasy." This episode established, he argues, that he was a naive, well-intentioned dreamer who believed his own claims and therefore did not defraud Bixby's shareholders. The government argued to the jury that Walker simply sensed another threat the board would remove him and contrived an elaborate hoax to preserve his position and remove hostile directors.

"Intent to defraud need not be proved by direct evidence." Brown, 627 F.3d at 1073 (quotation omitted). "Provided the victims suffered some tangible loss -- as they did here -- the scheme itself often serves as evidence of a defendant's intent to

defraud." United States v. Ervasti, 201 F.3d 1029, 1037 (8th Cir. 2000) (quotation omitted). The government introduced evidence of massive fraud. Walker responded that he did not intend to defraud those who invested in or did business with Bixby. This was a credibility issue, the province of the jury to resolve. Its adverse determinations "are virtually unassailable on appeal." United States v. Alama, 486 F.3d 1062, 1065 (8th Cir. 2007). The district court's statement to Walker near the end of the sentencing hearing aptly summarizes why we decline to disturb any part of the jury's verdict:

> You describe [the situation] as a dream that failed. That is not what happened here. . . . [Y]our behavior can only be viewed not as naive or as a dreamer, but as someone who only cares about [himself]. . . . Greedy narcissists with insatiable fantasies about [get-rich-quick] schemes do what you did here, sir. I know this sounds harsh, but I sat through two months of this testimony and read the statements of nearly 1,000 people, and no reasonable person could come to any different conclusion, and certainly the jury didn't in this case.

Turning to two remaining sufficiency issues, the witness-tampering charge was based on an email Walker drafted after leaving Bixby. The outside directors could not save the company, and they resigned. Sandy Newvine, an unsophisticated small investor, took over the company and came to rely on Walker's guidance. In May 2013, Jeff Wiseman, an important witness regarding Bixby's activities in China, emailed Newvine about Bixby's plans regarding its former Chinese buyers. Walker drafted an email for Newvine to send to Wiseman. It accused others within Bixby of engaging in a scheme to defraud Walker, the Chinese companies, and Bixby. Walker argues the email "had nothing to do with [his] upcoming trial" and "everything to do with [his] continuing belief that Bixby could be saved." But the evidence was sufficient for the jury to find that the misrepresentations were Walker's unsuccessful attempt to build a false defense at trial with the help of witness Wiseman.

The tax evasion counts concerned the $600,000 in kickbacks from DeSender that Walker excluded from his 2004-2006 tax returns. The evidence at trial included the backdated loan agreement, DeSender's testimony that the payments were commission-splitting kickbacks, and testimony that Walker, when interviewed, lied to an IRS agent, claiming the money was proceeds of the sham loan. On appeal, Walker argues the evidence established that he properly treated the money as a non-taxable loan. But the evidence was clearly sufficient for the jury to find that the payments were taxable kickbacks and that lying to the IRS agent was a willful attempt to evade taxes due. See United States v. Perry, 714 F.3d 570, 574 (8th Cir. 2013).

## II. Sentencing Issues.

The Presentence Investigation Report ("PSR") recommended that Walker's advisory guidelines offense level be increased by 24 levels because the actual fraud loss was approximately $57 million, the total loss reported by Bixby investors who submitted Victim Impact Statements. See U.S.S.G. § 2B1.1(b)(1)(M) (2013). Walker objected that the loss should be limited to his personal gain, $3.4 million, and that loss should not be the entire amount invested in Bixby because it was a company that produced and sold corn stoves. At sentencing, the district court overruled these objections and adopted the PSR's loss calculation. The court also applied a two-level increase for Walker's abuse of a position of trust. See U.S.S.G. § 3B1.3 (2013). These and other enhancements resulted in a total offense level of forty-seven and an advisory guidelines range of life in prison. See U.S.S.G. § 5A, cmt. n.2 (2013). Varying downward, the district court sentenced Walker to 300 months in prison.

**A. Fraud Loss Calculation.** On appeal, Walker argues the district court erred when it calculated actual loss without conducting a "net-loss analysis" that required subtracting from the Bixby investors' total loss the amount of loss "from legitimate

market factors and business expenses." Noting "the Government's analysis that nearly $30 million of the $57 million was invested during the corn stove period," Walker argues that loss cannot reasonably be calculated in this case using a net-loss analysis, and therefore loss for sentencing purposes is limited to his personal gain from the fraud, $3.4 million. See U.S.S.G. § 2B1.1, cmt. n.3(B) (2013). We review the district court's interpretation of loss *de novo* and its loss calculation for clear error. United States v. Hodge, 588 F.3d 970, 973 (8th Cir. 2009).

The advisory guidelines provide that "'[a]ctual loss' means the reasonably foreseeable pecuniary harm that resulted from the offense." § 2B1.1, cmt. n.3(A)(i). "The court need only make a reasonable estimate of the loss." Id. at cmt. n.3(C). Walker is correct that revised § 2B1.1 adopted a net loss approach, which recognizes "that the offender who transfers something of value to the victim generally is committing a less serious offense than an offender who does not." United States v. Markert, 732 F.3d 920, 932 (8th Cir. 2013), quoting U.S.S.G. App. C, Vol. II, Amend. 617, at 183 (2003). In Markert, we remanded for resentencing because the district court calculated the victim bank's actual loss to be the face amount of wrongful nominee loans without considering whether any part of the loans had been or would be repaid. Id. at 933.

The § 2B1.1 net loss analysis asks whether "the offender . . . transfer[red] something of value to the victim," not whether the victims' total losses were affected by "legitimate market factors," such as market conditions that may have caused the failure of Bixby's corn-stove business. Walker cites no evidence that the defrauded Bixby investors received any pecuniary benefits from the company while it was under Walker's control. Rather, as the district court noted at sentencing, early victims were induced to invest by Walker's fraudulent misrepresentations and were then lulled into believing that their investments were sound by Walker's repeated fraudulent actions throughout Bixby's disastrous corn-stove and coal-gasification ventures. "For many,

perhaps most fraud offenses, actual loss is properly and readily measured by the fair market value of property 'taken' from the victim." United States v. Markert, 774 F.3d 922, 926 (8th Cir. 2014). The district court committed no clear error in reasonably estimating the actual loss resulting from Walker's fraud offenses as equaling the total amounts lost by Bixby investors who submitted Victim Impact Statements.

**B. Abuse of a Position of Trust.** The district court imposed a two-level enhancement because Walker "abused a position of public or private trust." U.S.S.G. § 3B1.3 (2013). Walker argues this was procedural guidelines error because he "did not hold the type of position of trust contemplated by § 3B1.1." Determining what constitutes a position of trust is not always easy; "there is a component of misplaced trust inherent in the concept of fraud," and the enhancement is not intended to apply to every fraud offense. United States v. Hayes, 574 F.3d 460, 479 (8th Cir. 2009) (quotation omitted). "We review the legal component of the abuse of trust determination de novo and the district court's factual findings for clear error." United States v. Anderson, 349 F.3d 568, 573 (8th Cir. 2003).

To warrant an abuse-of-trust enhancement, the government must prove by a preponderance of the evidence that, "(1) defendant occupied a position of . . . trust, and (2) defendant used this position in a manner that significantly facilitated the commission *or concealment* of the offense." United States v. Miell, 661 F.3d 995, 998 (8th Cir. 2011) (emphasis added), cert. denied, 132 S. Ct. 1777 (2012). This fact-intensive inquiry "turns on the precise relationship between the defendant and [his] victims and therefore cannot be decided on the basis of generalities." United States v. Baker, 200 F.3d 558, 564 (8th Cir. 2000). At trial, the government presented expert testimony by a law professor regarding the basic corporate law principle that a controlling officer and director such as Walker owes a fiduciary duty -- a private position of trust -- to the corporation, and indirectly to its shareholders. We need not consider whether Walker abused this position of trust in fraudulently soliciting

persons to initially invest in Bixby; the trial record established that he repeatedly used his controlling corporate trust position to conceal his massive fraud offenses. Thus, the district court did not clearly err in imposing this two-level enhancement.

**C. A Final Issue.** On April 15, 2015, after Walker filed his initial Brief, the United States Sentencing Commission approved amendments to § 2B1.1 of the advisory guidelines. Congress did not object, and the amendments became effective November 1, 2015. See U.S.S.G., Supp. to App. C, Amend. 791-92, at 102, 110 (2015). Relying on our decision in United States v. Shields, 519 F.3d 836 (8th Cir. 2008), Walker argued in his Reply Brief and at oral argument that we should remand for resentencing because it is likely these amendments "will change dramatically" his advisory guidelines range. The contention is without merit because, if we did remand for resentencing, the district court would be required to "apply the guidelines . . . that were in effect on the date of the previous sentencing," namely, October 2, 2014. 18 U.S.C. § 3742(g)(1). Our decision in Shields is not to the contrary. There, defendant sought the benefit of intervening guidelines amendments the Sentencing Commission had made retroactive. Because a district court can consider retroactive amendments in ruling on a post-conviction motion for reduction of sentence under 18 U.S.C. § 3582(c), we remanded the direct appeal in Shields with the government's consent, an obviously efficient and expeditious procedure. 519 F.3d at 838. Here, as the government noted at oral argument, the Commission has not made retroactive the amendments on which Walker wishes to rely. Therefore, § 3742(g)(1) would apply if he were resentenced, making the requested remand a futile exercise.

The judgment of the district court is affirmed.

_____

-10-