# United States Court of Appeals
## For the Eighth Circuit

_____

No. 17-3279

_____

United States of America

*Plaintiff - Appellee*

v.

Keith Hagen

*Defendant - Appellant*

_____

Appeal from United States District Court
for the District of South Dakota - Aberdeen

_____

Submitted: October 25, 2018
Filed: February 28, 2019

_____

Before WOLLMAN, LOKEN, and ERICKSON, Circuit Judges.

_____

LOKEN, Circuit Judge.

Keith Hagen and Amanda Holy Bull, then husband and wife, established Holy Bull Cattle Company ("HBCC") in 2004 to provide custom grazing services to cattle producers on pasture land leased through the Bureau of Indian Affairs ("BIA"), which manages and leases land the federal government holds in trust on behalf of individual Indian owners. Hagen served as point of contact with cattle producers and worked the cattle, while Holy Bull arranged pasture land leases through the BIA.

Hagen and Holy Bull were charged with three counts of wire fraud, four counts of mail fraud, and one count of conspiracy to commit mail and wire fraud after cattle producers who contracted for grazing services during the 2012-2014 seasons received neither those services nor refunds of payments made to HBCC. Holy Bull pleaded guilty to the conspiracy count and testified for the government at Hagen's trial. After a three-day trial, the jury convicted Hagen of all eight counts. He was sentenced to concurrent terms of 46 months imprisonment and 3 years of supervised release on each count, restitution in the amount of $236,000, and a $100 special assessment on each count. Hagen appeals, arguing the evidence was insufficient to prove he had the requisite intent to defraud, and two mailings were not in furtherance of any fraud. Reviewing the evidence in the light most favorable to the jury's verdict, we affirm Hagen's conviction of conspiracy and two substantive fraud counts but vacate the conviction and special assessments on the other five substantive counts.

## Sufficiency of the Evidence

The grazing season in this region of South Dakota runs from May 15 to October 15 each year. The BIA leases pasture land through a negotiation process with individual trust land owners or through an advertised and open bid process each spring. Most leases run for one, three, or five years; payment is due in October of the year prior to the lease. In each lease, the BIA provides a default grazing ratio for the entire season of one cow-calf pair per six acres of land. A person seeking to graze more cow-calf pairs per acre must submit a grazing plan to the BIA for approval.

From 2004 through 2011, HBCC provided custom grazing services for one or two cattle producers each year on land leased through the BIA's negotiation process. Hagen promoted HBCC's services and contacted producers seeking pasture using an agricultural publication, the Farm Forum, known locally as the "Green Sheet." Business with producers ran smoothly these years, but the BIA wrote letters to Hagen and Holy Bull noting their noncompliance with the agency's leasing procedures --

-2-

signing multi-year leases in May 2008 that were later cancelled for nonpayment, grazing cattle on land where leases had not been paid, letting cattle get loose and trespass on other property, and overgrazing leased land. Hagen and Holy Bull never responded and did not submit grazing plans to deviate from the default grazing ratio.

In 2012, the first of the grazing seasons at issue, Holy Bull leased 347.53 acres of pasture through the BIA for grazing. Under the BIA grazing ratio, that land could support a full season of grazing for 57.92 cow-calf pairs. Without submitting a grazing plan to deviate from that ratio, Hagen and Holy Bull contracted with three cattle producers to graze at least 100 cow-calf pairs and 200 heifers. Andrew Stroschein grazed at least 70 pairs, as planned. Only 33 of John Haefner's 100 cow-calf pairs grazed with HBCC, and only for one day. Bruce Penner needed to find temporary grazing land at the beginning of the season because HBCC had not properly leased BIA land, and was forced to remove his 200 heifers five weeks early because the land HBCC supplied could not support the cattle. Haefner and Penner paid $30,000 and $46,000 in advance for HBCC grazing services; neither received a refund for services not provided.

In 2013, Holy Bull leased 547.53 acres of pasture through the BIA, which could support 91.26 cow-calf pairs under the BIA default ratio. Hagen contracted with six different producers to graze a total of 380 cow-calf pairs without submitting a grazing plan to the BIA. Each producer paid in full up front, a total of $126,500. Not a single cow grazed on HBCC-leased land, and no producer received a refund.

In 2014, Hagen and Holy Bull leased 40 acres of pasture through the BIA, which could support 6.67 cow-calf pairs under the default ratio. Hagen contracted with three different producers to graze 300 cow-calf pairs. Once again the producers paid in full up front, a total of $102,500. No producer brought a single cow to pasture, and none received a refund. One producer, Calvin Herrboldt, was able to avoid a loss by stopping payment on his check before Hagen could cash it.

The Conspiracy Count -- Count 1

Count 1 charged Hagen and Holy Bull with conspiracy to commit mail and wire fraud by contracting with twelve different cattle producers to graze over 700 cow-calf pairs and 200 heifers during the 2012-2014 grazing seasons for over $300,000, fulfilling only one contract, and failing to refund cattle producer payments for services not provided. Mail fraud is use of the mails to execute a "scheme or artifice to defraud," 18 U.S.C. § 1341; wire fraud is use of the wires to do the same, 18 U.S.C. § 1343; conspiring to do either is a separate offense, 18 U.S.C. § 1349. Each offense requires proof of intent to defraud, proof that the defendant willfully participated in a scheme with knowledge of its fraudulent nature and the intent to achieve illicit objectives. United States v. Bailey, 859 F.2d 1265, 1273 (7th Cir. 1988); see United States v. Louper-Morris, 672 F.3d 539, 555-57 (8th Cir. 2012).

In support of this charge, the government introduced detailed testimony regarding Hagen's above-summarized dealings with certain cattle producers in 2012, 2013, and 2014. The government also introduced evidence that five other cattle producers contracted and paid for HBCC grazing services those years but received neither services nor refunds, and that Calvin Herrboldt would have suffered a loss in 2014 had he not stopped payment on his check before Hagen could cash it. Many cattle producers testified that they contracted with Hagen and paid up front, but when grazing season began, Hagen pushed back the grazing dates, made excuses as to why the cattle could not come, or simply stopped communicating until producers were forced to arrange other grazing.

"In reviewing the sufficiency of the evidence, we consider the evidence in the light most favorable to the jury's verdict, accepting all reasonable inferences that support the verdict." United States v. Brown, 627 F.3d 1068, 1072-73 (8th Cir. 2010), cert. denied, 565 U.S. 892 (2011). "We must uphold the conviction unless no reasonable jury could find the defendant guilty." United States v. Walker, 818 F.3d

-4-

416, 419 (8th Cir. 2016) (cleaned up). After careful review of the extensive trial record, we conclude the evidence was sufficient to convict Hagen of conspiracy to commit mail and wire fraud.

The evidence established that Hagen contracted to graze substantially more cattle on land HBCC leased than the BIA default ratio recommended in both 2012 and 2013. And in 2014, Hagen contracted to graze 300 cow-calf pairs on 40 acres -- forty times more than the default ratio recommended and substantially more than 40 acres could support. Holy Bull testified she knew what she and Hagen were doing was wrong, but they needed the money to support their large family. While contracting that exceeds the BIA ratio does not without more prove intent to defraud, evidence that Hagen knowingly collected money to graze more cattle than his leased land could support permitted a reasonable jury to find the requisite fraudulent intent.

Hagen argues the evidence established only that he was a naive businessman who had no intent to defraud cattle producers. But when a defendant's victims "suffered some tangible loss -- as they did here -- the scheme itself often serves as evidence of a defendant's intent to defraud." United States v. Ervasti, 201 F.3d 1029, 1037 (8th Cir. 2000) (cleaned up). Given the government's evidence of a three-year scheme that resulted in extensive producer losses, Hagen's claim that he was simply a naive businessman "was a credibility issue, the province of the jury to resolve." Walker, 818 F.3d at 421.

The 2012 Season -- Counts 2 and 3

Counts 2 and 3 charged Hagen with using the wires to execute a scheme to defraud by cashing John Haefner's and Bruce Penner's checks for grazing services that were not provided during the 2012 grazing season. To establish wire fraud, the government must prove a "scheme," which "connotes some degree of planning by the perpetrator," specific intent to defraud, which "may be inferred from all the facts and

circumstances surrounding [Hagen's] actions," <u>DeMier v. United States</u>, 616 F.2d 366, 369 (8th Cir. 1980), and use of the mails or wires in furtherance of the scheme to defraud, <u>United States v. Tackett</u>, 646 F.2d 1240, 1244 (8th Cir. 1981). Hagen argues the government failed to prove that he acted with the requisite intent to defraud these producers. We agree.

Regarding Count 2, the trial evidence established that Haefner responded to an HBCC advertisement in the Green Sheet and paid Hagen $30,000 on April 13, 2012, for grazing services for 100 cow-calf pairs. Haefner was ready to bring his cattle to pasture on May 1, but Hagen could not take them until the second week in May. Haefner then brought 33 cow-calf pairs and unloaded them with Hagen's help, and Haefner's hired hand brought a second load the next day. After unloading, an unknown man stopped Haefner's hand and told him "the tribe was waiting for cattle to confiscate because [Hagen] hadn't paid his leases in four years." Hearing this, Haefner loaded up all of his cows and took them home.

On this evidence, we cannot say a reasonable jury could find Hagen acted with specific intent to defraud Haefner. Hagen began fulfilling the contract when he helped Haefner unload 33 cow-calf pairs. There was no evidence that, had an outsider not persuaded Haefner to walk away from the deal, Hagen would not have provided the agreed grazing services. Indeed, Hagen accused Haefner of breaching the contract by removing his cows. In these circumstances, that Haefner requested but did not receive a refund does not establish intent to defraud. Likewise, Hagen's possible non-compliance with the BIA grazing ratio does not establish intent to defraud. We vacate Hagen's conviction and the special assessment on Count 2.

Regarding Count 3, the evidence established that Penner responded to HBCC's advertisement in the Green Sheet, agreed to pay $46,000 to graze 200 heifers during the 2012 season, and wrote a check to HBCC for the full amount on April 18, 2012. Early in the grazing season, after delivering his cattle, the BIA advised Penner that

he must move his cattle because they were on land not properly leased by Hagen and Holy Bull. Two weeks later, Hagen and Holy Bull resolved the leasing issue and reimbursed Penner for the cost of substitute grazing. Penner returned his cattle to HBCC land but due to dry conditions, brought them home five weeks early. Hagen said he would refund Penner $12,000 for those five weeks but never did.

This evidence fails to establish Hagen cashed Penner's check in furtherance of a scheme to defraud Penner. Hagen attempted to fulfill the contract, but dry conditions occurring long after Penner's check was cashed forced its premature termination. Even if Hagen broke a promise to refund $12,000 for the early termination, breach of contract is not fraud, and the cashing of Penner's check in April was not in furtherance of any dispute that arose at the end of the grazing season. Accordingly, we vacate Hagen's conviction and the special assessment on Count 3.

The 2013 Season -- Counts 5, 6, and 7

Count 5 charged Hagen with using the mails to execute a scheme to defraud Robert Kriz by mailing Kriz a grazing contract for the 2013 season. The evidence established that Hagen, responding to an advertisement in the Green Sheet, offered to graze Kriz's cattle for the 2013 grazing season. The Kriz family typically pastured their cattle with the Stluka family, but due to a fire the two families needed new land on which to graze their cattle that season. Robert Kriz and John Stluka met Hagen and viewed the pasture, agreed to graze a total of 100 cow-calf pairs for $35,000 that season, and Holy Bull mailed the contract to the Krizes, who gave Hagen a check for $17,500 on April 23, 2013. When the time came to bring the cattle to pasture a month later, Hagen said he did not have the land to graze the cattle or the money to refund the Krizes. In August 2013, the Krizes received a letter from HBCC apologizing for any inconveniences and offering to graze their cattle for the rest of the season. By then, the BIA had informed David Kriz that Hagen did not have any pasture leased. The Krizes decided they would not risk losing their cattle by bringing them to HBCC.

-7-

Once again, although the question is somewhat closer, we conclude a reasonable jury could not find that Hagen caused the grazing contract to be mailed in furtherance of a scheme to defraud. The trial evidence established that Hagen had enough land to graze Kriz's 50 cow-calf pairs for the 2013 grazing season, well within the default BIA ratio of 91.26 pairs for the land HBCC leased that season. The letter Hagen sent in August offered to belatedly fulfill his end of the deal by grazing Kriz's cattle for the rest of the season. The government failed to prove he had no intent or no ability to carry out that offer. Thus, the evidence did not establish either a scheme to defraud or Hagen's specific intent to defraud Robert Kriz when the grazing contract was mailed in April 2013. Accordingly, we vacate Hagen's conviction and the special assessment on Count 5.

Counts 6 and 7 charged that Hagen used the mails to execute a scheme to defraud Robert Kriz and John Stluka when he sent them letters in August 2013 offering to graze their cattle for the remainder of the season. Under 18 U.S.C. § 1341, the alleged use of the mail must be "sufficiently closely related to," and operate to further, the defendant's scheme. Tackett, 646 F.2d at 1244. Hagen argues the government failed to prove these letters were used in furtherance of the fraud alleged. We agree.

The letters underlying Counts 6 and 7 were sent in August of 2013, some four months after Hagen received payments from Kriz and Stluka for 2013 grazing and three months after the start of the grazing season. Thus, the letters were not sent for the purpose of executing the alleged scheme to defraud these producers, for Hagen had already received their payments for cattle HBCC was not grazing. Mailing the letters had no effect on the success or failure of the alleged scheme; it was already completed. As in Tackett, Hagen's "after-the-fact, unsolicited, incidental mailing[s] at issue" cannot sustain his conviction on Counts 6 and 7. Id. at 1244.

The government argues that these letters to producers Kriz and Stluka furthered the scheme to defraud because they were "designed to lull the victims into a false sense of security, postpone their ultimate complaint to the authorities, and therefore make the[ir] apprehension . . . less likely." United States v. Lane, 474 U.S. 438, 451 (1986) (quotation omitted). However, Hagen's letters accepting responsibility, apologizing for delay and inconvenience, and offering to fulfill the Kriz and Stluka grazing contracts are not communications that would postpone inquiries or complaints to the BIA or other authorities. And unlike the evidence in United States v. Fiorito, 640 F.3d 338, 348 (8th Cir. 2011), neither Kriz nor Stluka testified that he was lulled into a false sense of security. Indeed, when asked on direct exam what their responses were to this letter, Steve Stluka testified, "I just kind of laughed. . . . I mean, it's too late," and Robert Kriz testified, "My honest reaction was, why do we want to take cattle down there? We've already lost $35,000 between the two of us." This brief testimony did not establish the letters were in furtherance of schemes to defraud. Accordingly, we vacate Hagen's convictions and the special assessments on Courts 6 and 7.

The 2014 Season -- Counts 4 and 8

Counts 4 and 8 charged that Hagen used mail and wire to execute a scheme to defraud Robert Berg during the 2014 grazing season when Berg mailed Hagen a $35,000 check on May 30, 2014, in full payment of a grazing contract (Count 8) and Hagen cashed the check using wire transmission on June 4, 2014 (Count 4). After Hagen responded to Calvin Herrboldt's Green Sheet ad in the spring of 2014 seeking grazing land that season, Herrboldt alerted Berg, a family friend, who was also looking to graze 100 cow-calf pairs. At this time, HBCC had leased only 40 acres of pasture, which could support 6.67 cow-calf pairs under the BIA default ratio. Berg's son Riley traveled to view Hagen's pasture, where Hagen assured him there was enough land to support the two producers' 200 cow-calf pairs. That day, Hagen gave Riley a signed contract to custom graze 100 cow-calf pairs for $35,000, and Riley

gave Hagen a check for the full amount. However, the Bergs stopped payment on the check after a second visit to the pasture. In response, Hagen repeatedly called the Bergs, assuring them he had enough leased land but insisting on full payment up front. Still in need of pasture, Berg mailed Holy Bull a second check for $35,000, which was promptly cashed. Later, when the time came for grazing, Berg called Hagen several times to plan delivery. Hagen never returned the calls. The Bergs grazed no cattle on HBCC pasture and never received a refund.

Based on this evidence, the jury reasonably found that Hagen had the intent to defraud Robert Berg. Knowing only 40 acres of land had been leased for grazing, Hagen nonetheless contracted to graze a quantity of cow-calf pairs that 40 acres could not possibly support. He accepted Berg's payment in advance, then repeated the misrepresentation that he had leased sufficient pasture land to induce a second payment in advance from a skeptical client who had stopped payment on the first check. When it was time to graze the cattle, Hagen disappeared with the client's money. As this was a victim who suffered tangible loss, "the scheme itself . . . serve[d] as evidence of [Hagen's] intent to defraud." Ervasti, 201 F.3d at 1037. Moreover, Holy Bull testified that she and Hagen knew the land could not support the cattle they agreed to graze but took the money anyway.

Hagen argues the government failed to prove he intended to defraud Berg because there was evidence that he expected to lease the same amount of land through the BIA for the 2014 season as he had in the past. However, in June 2014, Hagen had only administratively appealed the BIA's decisions to lease HBCC only 40 acres that season. Not only was the outcome of the appeal uncertain, it was also impossible that the appeal would be decided in his favor before the 2014 grazing season because it was not received by the BIA until June 30, 2014. Thus, when Hagen contracted to

-10-

graze Berg's 100 cow-calf pairs, Hagen knew he was promising to graze substantially more cattle than his 40 acres could possibly support -- a sailor's promise.[1]

On this evidence, Hagen's intent to defraud Berg is "a credibility issue, the province of the jury to resolve." Walker, 818 F.3d at 421. We conclude the jury reasonably found that Hagen, "having devised or intending to devise any scheme or artifice to defraud," used mail and wire "for the purpose of executing such scheme or artifice." 18 U.S.C. §§ 1341, 1343. Accordingly, we affirm Hagen's conviction and sentence on Counts 4 and 8.

## Conclusion

For the foregoing reasons, we instruct the district court to vacate the convictions and special assessments on Counts 2, 3, 5, 6, and 7. In all other respects, the judgment of the district court is affirmed. See United States v. Grimes, 702 F.3d 460, 469, 472 (8th Cir. 2012).

———————————————

[1]"'Tis but a sailor's promise, weather-bound," made not with the intent to keep, but to break as soon as the seas are calm enough to sail. Robert Browning, Sordello (1840), reprinted in The Poetical Works of Robert Browning 115, 150 (Augustine Birrell ed., 1902).